KIMBERLY WILLIAMS-ELLIS,          )
on behalf of herself and all others          )
similarly situated,          )
                                                         )
                          Plaintiff,          )
                                                         )
          vs.                                     )          05 C 5030
                                                         )
MARIO TRICOCI HAIR SALONS AND          )
DAY SPAS, and ELIZABETH ARDEN          )
SPAS, LLC,          )
                                                         )
                          Defendants.          )

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This matter is before the Court on Defendant Mario Tricoci Hair Salons and Day Spas, Inc. ("MT") and Defendant Elizabeth Arden Spas, LLC ("EA Spas") (collectively, "Defendants")' motion for summary judgment. For the following reasons, Defendants' motion is granted in part and denied in part.

## BACKGROUND

The following material undisputed facts have been taken from only those portions of the parties' statements of material facts that conform with Local Rule 56.1. *See Brasic v. Heinemann's Inc.*, 121 F.3d 281 (7th Cir. 1997). At issue in this

litigation is the cost of Plaintiff Kimberly Williams-Ellis ("Ellis")'s haircut at one of MT's salons. Ellis says she was quoted a price of $40 for her haircut, but when she examined her receipt, she learned that she was charged $65 for an "Ethnic Women's Haircut."

In December 2004, Ellis consulted MT's internet website, and learned that prices for haircuts at MT "start at" $40. She also made two separate telephone calls to MT's call center. During her first call, Ellis spoke with an MT representative about various treatments. She was informed that the cost of a haircut at MT was "generally" $40. A few days later, Ellis called again to schedule a series of appointments for April 7, 2005. During the call, she informed the MT representative that she was African-American because she "wanted somebody who knew what they were doing on [her] hair." Ellis testified that the MT representative informed her that her haircut would cost $40. Ellis's reservation was entered into MT's computer reservation system and booked to SKU #2122, an "Ethnic Women's Haircut."

There exists significant dispute as to the reasons and criteria for charging a woman the higher "ethnic" hair charge. Defendants submit the affidavit of one of MT's call center managers and trainers, Aileen Cordero, who attests that the higher "ethnic" charge is imposed by the stylist when the texture of an individual's hair requires extra skill, time, tools, and product to style. Ellis contends that the charge was

instead imposed on the basis of race, rather than upon the basis of actual time and skill required to style an individual's hair. In support of this argument, she points to testimony of MT hair stylists as well as documents evidencing that MT stylists have two "base" rates - one for ordinary haircuts and one for "ethnic" haircuts. Further, the parties dispute the extent to which non-African-American women are charged the "ethnic" hair charge. While Cordero attests that "ethnic hair" is a standard term used to describe hair texture, rather than race, Ellis points to testimony from MT's hair stylists, who testified that the vast majority of their "ethnic" hair charges are applied to African-American women, and to testimony from other MT educators and trainers, who are unaware of the term "ethnic hair."

On April 7, 2005, Ellis arrived at MT's Oakbrook, Illinois, salon and was given a list of services she would receive that day as well as a written brochure stating that prices for haircuts "start at" $40. Ellis' hair stylist, Taylor, was a senior stylist who had worked for MT for 15 years (Taylor is the salon name used by Laurie Festag). Taylor cut and blow-dried Ellis' hair. Ellis testified that Taylor used no special tools or chemicals, and merely trimmed her ends. Ellis felt that her haircut was "fine" and she visited her regular stylist a few days later to have her hair done again.

A dispute exists over whether or not Taylor charges the same rate to all new customers and whether or not Taylor would have charged Ellis $65 regardless of her

ethnicity. While Cordero attests that Taylor's standard price is $65, the same price as Ellis was charged, documents produced by MT indicate that Taylor charges clients a range of prices, and that her base price for a woman's haircut is $10 less than her base price for an "ethnic" woman's haircut.

Ellis never discussed the price of a haircut with Taylor, or with anyone else at MT on April 7th. She paid for her services with two gift certificates and either a credit or a debit card. She was handed a receipt, which she signed, and kept the customer copy for her records. She did not realize she had been charged $65 for her haircut until the next day.

On April 8, 2005, Ellis called the MT call center to complain that she had been overcharged and requested a $25 refund. She did not tell the representatives that she had been quoted a $40 price for the haircut. Ellis was directed to Tom Bell, whom she believed to be a regional manager. She left two messages with Bell, in which she informed him that she had been quoted a price of $40 for her haircut but was charged $65. Bell never returned her calls; MT refused to refund her $25, and Ellis filed the instant lawsuit.

Although this litigation is styled as a class action, Defendants have moved for summary judgment on all of Ellis's individual claims. During briefing on summary judgment, the parties continued to conduct discovery, in the form of a survey of MT

customers who were charged the "ethnic hair" charge.  Dr. Ricardo Cossa, a statistics expert, was given the results from the survey.  He explained that because of the small sample (586 people), the results could be interpreted in one of two ways.  Under the first interpretation, the survey results indicate that there is a 53% confidence level that of the persons surveyed, 80.1% and 86.1% were African-American.  Under the second interpretation, there is a 90%-95% confidence level that between 74.9% and 91.3% of the sample were African-American.  Ellis argues that these results demonstrate that the majority of MT customers charged for an "ethnic women's haircut" are African-American.  Alternatively, MT argues that the survey results do not indicate a discriminatory practice, but rather demonstrate that MT charged persons of other races for an "ethnic women's haircut."  Once discovery was completed, the parties were permitted to supplement their briefs.  Now that the issues are fully briefed and investigated, the instant motion is ripe for decision.

## LEGAL STANDARD

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact by specific

citation to the record, at which time the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue of fact for trial. Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); rather, "[a] genuine issue exists when the evidence is such that a reasonable jury could find for the non-movant." *Buscaglia v. United States*, 25 F.3d 530, 534 (7th Cir. 1994). At summary judgment, we construe all facts and draw all inferences from the record in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Decisions on the merits in a putative class action may be made prior to the certification of a class pursuant to Fed. R. Civ. P. 23. *Cowen v. Bank United of Texas, FSB,* 70 F.3d 937, 941 (7th Cir. 1995) (recognizing that class certification may not be "practicable" prior to summary judgment, and that class action defendants may be permitted to take the calculated risk of dismissing only the named plaintiffs' claims). A decision on the merits prior to class certification binds only the named plaintiff. *See Harold Washington Party v. Cook County, Illinois Democratic Party*, 984 F.2d 875, 878 (7th Cir. 1993).

# **DISCUSSION**

Ellis, on her own behalf and on behalf of a putative class of similarly situated individuals, filed this lawsuit alleging that MT and EA Spas employ an undisclosed, two-tier pricing system, by which they charge minority clients higher prices than similarly situated Caucasian clients for identical salon services. Ellis contends that Defendants' alleged practices violate federal and state statutes prohibiting racial discrimination and amount to fraud and breach of contract under state law. She seeks equitable remedies as well as compensatory and punitive damages. Defendants have moved for summary judgment, arguing that Ellis's claims lack sufficient factual support and are deficient as a matter of law.

## I.    **42 U.S.C. § 1981**

Ellis claims that Defendants' undisclosed pricing structure, under which she alleges that minority clients are charged more for the same services, violates her right to make and enforce contracts on equal terms as white citizens as provided by 42 U.S.C. § 1981(a). Section 1981's guarantee of equal rights in contracting includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." § 1981(b). To sustain a claim of racial discrimination under § 1981, Ellis must show that she is a member of a racial minority, that defendants intended to discriminate against

her based upon her race, and that the discrimination concerned the making and enforcing of a contract. *See, e.g., Morris v. Office Max, Inc*., 89 F.3d 411, 413 (7th Cir. 1996).

Defendants argue that there was no discrimination, because Ellis would have been charged the same rate for her haircut regardless of her race. As discussed above, a genuine dispute exists with respect to how and why Taylor chose to impose her standard or ethnic haircut charge, and summary judgment on this basis is inappropriate.

Defendants also argue that Ellis cannot claim discrimination because she was never told that she was being charged more on account of her race. As the Seventh Circuit has explained, a plaintiff is not limited to relying upon direct admissions of discrimination, and may use circumstantial evidence to prove his or her case. *Sylvester v. SOS Children's Villages Illinois, Inc*., 453 F.3d 900, 902 (7th Cir. 2006) (noting that circumstantial evidence can be just as probative as traditional "direct evidence" such as eyewitness testimony, even though "on average circumstantial evidence requires a longer chain of inferences.")[1]

_____

[1] The Seventh Circuit has not yet held that the burden-shifting "indirect" method of proof first established in *McDonnell-Douglas* Corp. v. Green , 411 U.S. 792 (1973) applies to § 1981 claims outside the realm of employment discrimination. *Vakharia v. Swedish Covenant Hosp*., 190 F.3d 799, 806 (7th Cir. 1999) (§ 1981 claim concerning the making and enforcing of contracts of employment analyzed under the same framework as is used for Title VII claims).

Defendants explain that Taylor charges new customers $65 for a haircut and that her fee can be increased if the texture of the customer's hair requires special techniques, products, and/or additional time to style. Ellis counters Defendants' explanation, noting that the information used to create the survey results show that Taylor charges some customers less than $65. Ellis also explains that no special products or tools were used during her haircut; it was basically a trim and a blow-dry. In addition, Ellis points to testimony by several stylists, who have testified that the "ethnic" charge is imposed largely upon African-American women, as well as documentary evidence that Defendants' stylists' base rates are different for "normal" and "ethnic" women's hair. Accordingly, Ellis has presented sufficient evidence to demonstrate the existence of a genuine dispute of fact concerning whether or not race, rather than actual time and effort expended, motivates the imposition of a higher charge.

Defendants' final argument is that Ellis cannot claim discrimination because she was not refused service. In support of their argument, Defendants cite cases in which defendants sought to bring § 1981 claims for their treatment once inside a retail establishment. *See Morris*, 89 F.3d at 414 (defendants claimed they were singled out as potential shoplifters); *Robertson v. Burger King, Inc*., 848 F.Supp. 78, 81 (E.D. La. 1994) (plaintiff claimed that white patrons were served before she was served);

*Stearnes v. Baur's Opera House, Inc.*, 788 F. Supp. 375, 378 (C.D. Ill. 1992) (plaintiff alleged that dance hall refused to play music popular with African-Americans). Defendants' argument ignores the plain language of the statute, which requires equality not just in the making of a contract, but also in the terms and conditions of the contract. In this case, Ellis's claim is that she was charged a higher price on account of her race. Discriminatory pay requirements are sufficient to state a claim under § 1981. *See, e.g., Hill v. Shell Oil Co.,* 78 F. Supp. 2d 764, 777 (N.D. Ill. 1999) (claim that gas station required African-American customers, but not white customers, to pre-pay for their gasoline directly impaired the right to contract on equal terms); *Arguello v. Conoco, Inc.*, 330 F.3d 355, 361 (5th Cir. 2003) (holding that a "plaintiff is able to show the loss of an actual contractual interest merely by demonstrating that he was party to a discriminatory contract"). Ellis has produced evidence that Taylor maintained two base rates for haircuts, and she may have been charged the higher charge on account of her race, rather than for any business reason. While Defendants dispute this interpretation of the facts, Ellis has produced sufficient evidence to allow her to proceed on her claims under 42 U.S.C. § 1981.

## II.     42 U.S.C. § 2000a

Ellis claims that Defendants' alleged practices also violate 42 U.S.C. § 2000a, which prohibits places of public accommodation from denying to any person the full

and equal enjoyment of goods and services on the basis of race. Places of public accommodation include, *inter alia*, "any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment." § 2000a(b). Ellis alleges that Defendants' salons are "places of exhibition and entertainment" because Defendants hold their salons out to be places of "pleasure and relaxation," where a "spa experience" will "bring a sense of comfort to the very center of your being, transforming your body, mind, and soul into a temple of serenity." As facilities whose purposes are to provide relaxation, enjoyment, and diversion, Ellis argues, Defendants' salons are recreational facilities subject to the requirements of § 2000a. Defendants argue that their businesses are essentially hair salons, which historically have not been considered to be places of public accommodation under the statute.

The Supreme Court has held that the term "place of entertainment" should be "given full effect according to its generally accepted meaning." *Daniel v. Paul*, 395 U.S. 298, 306 (1969). In holding that recreational facilities were places of entertainment, the Supreme Court relied upon the common definition of the term entertainment as "the act of diverting, amusing, or causing someone's time to pass agreeably: [synonymous with] amusement." *Id.* at 306 n.7. Following *Daniel*, appellate courts have held that parks, swim clubs, health clubs, poolrooms, YMCAs, amusement areas, and skating rinks are places of entertainment subject to § 2000a.

*Denny v. Elizabeth Arden Salons*, 456 F.3d 427, 433 (4th Cir. 2006) (citing cases).

In support of her argument, Ellis relies upon a decision holding health clubs to be places of entertainment. *Rousseve v. Shape Spa for Health and Beauty, Inc*., 516 F.2d 64, 65 (5th Cir. 1975). In *Rousseve*, the Fifth Circuit examined the programs of diet and exercise offered by the club, as well as their wellness and workout facilities, and determined that the club's facilities and purpose made it a "recreational facility" similar to those operated by organizations such as the YMCA, already covered under § 2000a. Ellis argues that, like the health club in *Rousseve*, Defendants' salons offer massages, facials, and spa treatments and hold themselves out to be places of relaxation. Therefore, they should be considered a "place of entertainment."

On the other hand, Defendants point to *Denny*, in which the Fourth Circuit considered the services offered by one of EA Spas' salons, and held that although the salon provides body maintenance services which might provide relaxation, the spa was not a place of entertainment similar to those places whose main purpose was recreation and activity. 456 F.3d at 434. The *Denny* court explicitly distinguished *Rousseve*, pointing out that a salon and day spa does not offer the type of recreational facilities that are available at a health club. *Id*. Instead, the Fourth Circuit noted that the principal function of the salon/spa was to provide hair, skin, and body care. Simply because those services also provided "tangential entertainment value" was not a basis

to determine that the salon/spa at issue was a place of entertainment under § 2000a. *Id*. at 432.

Although a day at a spa might be enjoyable, the services offered by Defendants do not come within the traditional definition of "amusement" as it has been applied by the courts. There is a distinct difference between establishments offering as their primary focus activities commonly considered to be recreational, such as swimming, and those offering services or goods, the enjoyment of which might incidentally be relaxing. Accordingly, we agree that Defendants' salons are not places of public accommodation as defined in the statute and grant summary judgment to Defendants on Ellis's § 2000a claim.

## III. Illinois Human Rights Act

The Illinois Human Rights Act,("IHRA"), 775 ILCS 5/1-101 *et seq*., prohibits discrimination in places of public accommodation such as barber shops. 775 ILCS 5/15-102, 775 ILCS 5/5-101(A)(2). Defendants argue, however, that Ellis has not exhausted her administrative remedies under the IHRA and that this Court therefore lacks jurisdiction to hear her claims. 775 ILCS 5/8-111(c). Citing the IHRA's comprehensive administrative review scheme, the Seventh Circuit has held that federal district courts lack jurisdiction over independent actions for alleged human rights violations until plaintiffs have exhausted their administrative remedies under the IHRA.

*Talley v. Washington Inventory Service*, 37 F.3d 310, 312 (7th Cir. 1994). Ellis has proffered no evidence that she has invoked administrative remedies under the IHRA, and accordingly we find that we do not have jurisdiction over her IHRA claim.

## IV.    Illinois Consumer Fraud and Deceptive Business Practices Act Claim

The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq*., prohibits unfair or deceptive acts or practices in the conduct of trade or commerce. Defendants contend that Ellis has not shown evidence that they have adopted any deceptive policy or practice under which minorities are charged higher prices for the same services, because their ads state only that haircut prices "start at" $40. Instead, they argue that Ellis' dispute is merely a breach of contract claim because she is only complaining that she was originally quoted a price of $40 but later charged more. Finally, Defendants argue that Ellis cannot show reasonable reliance on the alleged misrepresentation, nor can she show actual damages.

To sustain a claim under the ICFA, Ellis must establish: "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Avery v. State Farm Mut. Auto. Ins. Co.*, 35 N.E.2d 801, 850 (Ill. 2005). While the statute is to be liberally construed to effect its purposes, *id.* at 853, it is

intended to reach practices affecting consumers generally, rather than simple breach of contract actions in which a contractual promise goes unfulfilled. *Id*. at 844.

Defendants unduly simplify Ellis's claim, which is more than a simple breach of contract action. Ellis is not complaining that defendants' failure to fulfill their promise to cut her hair for $40 is the deceptive practice. Instead, she is claiming that their entire pricing scheme, in which they fail to disclose that they charge minorities more for the same services, is the deceptive practice. This is more than a contractual dispute, and does concern an allegedly deceptive policy and practice that affects consumers generally - the very type of policy and practice which the ICFA is designed to address.

Defendants also argue that Ellis's claim fails because she cannot show reasonable reliance on Defendants' alleged misrepresentation. However, it is settled law in Illinois that a plaintiff is not required to show reasonable reliance in order to maintain a claim under the ICFA. *Martin v. Heinold Commodities, Inc*., 643 N.E.2d 734, 754 (Ill. 1994). Despite Defendants' multiple citations to cases involving common law fraud rather than statutory fraud, the Illinois Supreme Court has repeatedly stated the requirements for a cause of action under the ICFA are less stringent than those required to maintain a claim of common law fraud. *See, e.g., Siegel v. Levy Organization Development Co., Inc*., 607 N.E.2d 194, 198-99 (Ill. 1992).

A plaintiff is, however, required to show that her damages were proximately caused by the alleged deception. *See, e.g., Avery,* 35 N.E.2d at 850. Ellis may satisfy this requirement by demonstrating that she was "in some manner deceived." *Id.* at 860 (quoting *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 164 (Ill. 2002). Deception may be established, at the very least, where plaintiffs have seen the allegedly deceptive ads and those ads have influenced them in some way. *Shannon v. Boise Cascade Corp.*, 805 N.E.2d 213, 217 (Ill. 2004) (holding that "deceptive advertising cannot be the proximate cause of damages under the Act unless it actually deceives the plaintiff"). Where deceptive advertising gets the plaintiff "in the door" such "bait and switch" schemes have been held to be an ICFA violation. *See Chandler v. American General Finance, Inc.* 768 N.E.2d 60, 69 (Ill. App. Ct. 2002). In this case, Ellis has shown sufficient evidence that she saw and reviewed Defendants' advertisements and spoke to their representatives before going to the salon. She has also produced evidence that neither Defendants' ads nor their representatives mentioned that there was an additional charge for ethnic hair.

Finally, Defendants argue that Ellis has not sustained actual damages. In support, they assert that the evidence shows that Ellis would have been charged $65 for her haircut regardless of her race or ethnicity. As we have discussed above, a genuine dispute of fact exists with respect to this issue and it is not appropriate for

summary judgment.

## V. Common Law Fraud Claims

Ellis argues that Defendants made affirmative representations and concealed material facts regarding the salon's pricing practices that amount to fraudulent concealment, misrepresentation, and inducement. As these claims share common elements of proof, we address them together.[2]

### A. Preemption by the Illinois Human Rights Act

As an initial matter, Defendants argue that Ellis's common-law fraud claims are preempted by the exclusive remedies of the IHRA. The Illinois Supreme Court has held that the IHRA precludes a court from exercising jurisdiction over tort claims that are "inextricably linked to a civil rights violation such that there is no independent basis for the action apart from the [IHRA] itself." *Maksimovic v. Tsogalis*, 687 N.E.2d 21, 23 (Ill. 1997). This rule, however, does not preclude the exercise of jurisdiction over tort claims that are factually related to civil rights claims, so long as a plaintiff can

---

[2] Several of the arguments in this section went unaddressed and undeveloped by both sides. We note that failure to address and develop claims can constitute waiver. *See 330 West Hubbard Restaurant Corp. v. United States,* 203 F.3d 990, 997 (7th Cir.2000) ("A party's failure to address or develop a claim in its opening brief constitutes a waiver of that claim, for it is not the obligation of this court to research and construct the legal arguments open to the parties, especially when they are represented by counsel .... In order to develop a legal argument effectively, the facts at issue must be bolstered by relevant legal authority; a perfunctory and undeveloped assertion is inadequate to raise a separate basis for appeal.")

"allege[d] the elements of each of these torts without reference to legal duties created by the [IHRA]" such that there is an independent basis for liability. *Id.*; *see also Krocka v. City of Chicago*, 203 F.3d 507, 516-17 (7th Cir. 2000). Defendants do not explain why they believe that Ellis' fraud claims are so inextricably linked to her civil rights claims as to be preempted by the IHRA. Her claim of fraud does not depend on her allegation that she was charged a higher price on the basis of her race; instead, it depends on the price differential alone and her allegation that she was charged $65 after being quoted a price of $40. Accordingly, her claims are not preempted by the IHRA.

### B. Fraudulent Concealment

Under Illinois law, a plaintiff seeking to maintain a cause of action for fraudulent concealment must show that the defendant concealed a material fact when he was under a duty to disclose that fact to the plaintiff. *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 593 (Ill. 1996). The duty to disclose may arise out of a fiduciary or confidential relationship, or out of a special relationship, such as those created from friendship, agency, or experience, in which the plaintiff's trust and confidence in the defendant places the defendant in a position of influence and superiority over the plaintiff. *Id.* Defendants correctly note that Ellis has not alleged, nor has she argued, that she was in a confidential, fiduciary, or other special relationship with MT.

Furthermore, Illinois courts have consistently held that arms'-length business transactions, such as the ones at issue in this litigation, generally do not give rise to a "special relationship" and concomitant duty to speak. *See, e.g., Miller v. William Chevrolet/GEO*, Inc. 762 N.E.2d 1, 13 (Ill. App. Ct. 2001). Thus, Ellis has not produced sufficient evidence to allow her to proceed with a cause of action for fraudulent concealment.

### C.     Fraudulent Misrepresentation and Inducement

Defendants attack Ellis's fraudulent misrepresentation and inducement claims as insufficient in law and unsupported by the evidence. The foundation of both fraudulent misrepresentation and fraudulent inducement claims is a showing that a defendant made a false statement of material fact. *Seigel,* 607 N.E.2d at 198; *Kinn v. Prairie Farms/Muller Pinehurst,* 859 N.E.2d 99, 103 (Ill. App. Ct. 2006). Defendants argue that the allegedly fraudulent statement (the price of a haircut) was an expression of opinion as it relates to future events, rather than a statement of material fact and therefore cannot be the basis of a fraud claim.

Generally, expressions of opinion and statements regarding future events are not statements of fact that would support a claim of fraud. *See, e.g., Prime Leasing, Inc. v. Kendig*, 773 N.E.2d 84, 92 (Ill. App. Ct. 2002). However, a determination of whether or not a statement is one of fact is made after an examination of all the

circumstances of the particular case. *See, e.g., id*. In this case, Ellis has testified that she was specifically told that the haircut she was booking would cost $40. This is materially different from the types of statements held to be opinions, such as representations concerning value or promises of future conduct. Specific statements such as the price quotation made by MT's representative concerning the specific cost of a service, even if that service is not performed on the day the price is given, have been held to be facts, rather than opinions or promises. *See, e.g., Cincinnati Ins. Co. v. Guccione*, 719 N.E.2d 787, 792 (Ill. App. Ct. 1999) (false characterization of price of insurance policy was fact, not promise of future conduct); *Peter J. Hartmann Co. v. Capital Bank and Trust Co.,* 694 N.E.2d 1108, 1115 (Ill. App. Ct. 1998) (promises concerning the potential cost of cleanup based upon soil analysis consisted of existing, quantifiable facts and were more than mere opinions); *People ex rel. Peters v. Murphy-Knight*, 618 N.E.2d 459, 464 (Ill. App. Ct. 1993) (representations as to the physical capabilities of air-conditioning system held to be statements of present fact rather than promises of future performance). Furthermore, the $40 price quote was given to Ellis by an employee of MT at MT's call center. Even if the $40 quote was considered an opinion, Ellis has presented sufficient evidence to entitle her to argue to a jury that MT's statements were "made as a statement of fact for the listener to rely upon" in "pursuance of a scheme....to induce [Ellis] to trade with [MT]." *See, e.g., Duhl v. Nash*

*Realty Inc.*, 429 N.E.2d 1267, 1272-73 (Ill. App. Ct. 1981) (citing *Buttitta v. Lawrence*, 178 N.E. 390, 393 (Ill. 1931). Whether she chooses to present the price quote as fact or as opinion in furtherance of a scheme to defraud, Ellis has presented sufficient evidence to allow her claim to proceed.

Defendants' remaining arguments with respect to their own knowledge and the reasonableness of Ellis' reliance are arguments grounded on their interpretation of disputed issues of fact. Accordingly, summary judgment is improper on Ellis's fraudulent misrepresentation and fraudulent inducement claims.

## VI.  Breach of Contract

Ellis alleges that Defendants charged her more than the advertised price for salon services and that the increased charge amounts to breach of contract. Defendants assert that her claim is deficient on two grounds. First, they argue that there was no contract because there is no evidence of definite terms, as Ellis has not identified any document stating that her haircut would cost $40. It is a matter of hornbook law that oral contracts are valid in Illinois. *See, e.g., Gaffney v. McCarron*, 360 N.E.2d 508, 509 (Ill. App. Ct. 1977). Ellis has testified that MT's employee told her that her haircut would cost $40. These are terms sufficiently definite to establish a valid and enforceable oral contract. *See, e.g., Martin v. State Farm Mut. Auto. Ins. Co.* 808 N.E.2d 47, 55 (Ill. App. Ct. 2004) ("for an oral contract to be valid and enforceable, its terms must be

definite and consistent."). MT contends that its employee misspoke but has offered no evidence to that effect nor has it argued that the employee lacked the authority to quote prices. Accordingly, a genuine dispute of fact exists as to whether or not there was a meeting of the minds that could give rise to an oral contract.

However, Defendants assert that Ellis's claim is barred by Illinois's voluntary payment doctrine. In Illinois, "the rule is that in the absence of fraud, misrepresentation, or mistake of fact money voluntarily paid under a claim of right to the payment, with full knowledge of the facts by the person making the payment, cannot be recovered unless the payment was made under circumstances amounting to compulsion." *King v. First Capital Financial Services Corp.*, 828 N.E.2d 1155, 1171 (Ill. 2005). Because Ellis was given the opportunity to review the receipt but still signed the receipt and paid for the services, Defendants argue, she was not defrauded or mistaken as to the facts and cannot recover for any overpayment. Ellis addresses Defendants' claims only in passing, arguing that evidence of their fraud is substantial enough to prohibit summary judgment on a theory of voluntary payment. However, Illinois law holds that "a party having full knowledge of the facts, and access to a written instrument, may not reasonably rely on representations of other contracting parties respecting the effect of the written instrument." *Jursich v. Arlington Heights Federal Sav. and Loan Ass'n,* 441 N.E.2d 864, 868 (Ill. App. Ct. 1982); *Filosa v. Pecora*, 309 N.E.2d 356, 359 (Ill. App.

Ct. 1974). Regardless of prior representations and promises, Ellis' receipt clearly discloses the amount of the charge and the reason ("Ethnic Hair Charge"). Ellis should have, but did not, review the receipt before paying. Accordingly, the voluntary payment doctrine bars her from recovering under a breach of contract theory.

## VII. Unjust Enrichment and Requests for Equitable Relief

For the reasons discussed previously, disputed questions of fact exist as to whether or not Ellis was charged a higher price for her haircut on the basis of her race, rather than on the basis of the time or skills required to cut her hair, and whether or not Defendants maintain a pricing structure for haircuts that is applied on the basis of race rather than a nondiscriminatory basis. Accordingly, summary judgment is inappropriate on Ellis's unjust enrichment claim and her claims for equitable relief.

<u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion for summary judgment [64] is granted as to Ellis' claims under 42 U.S.C. § 2000a (Count II), under the Illinois Human Rights Act (Count III), and for breach of contract (Count V), and denied as to the remaining counts of her amended complaint.

Charles P. Kocoras
United States District Judge

Dated:  November 1, 2007